BRYANT, Judge.
Where defendant failed to preserve the denial of his motion to dismiss and his argument regarding the sufficiency of the evidence to support both indictments, we dismiss Issues I & II . Where defendant failed to establish prejudice from the admission of challenged testimony, there was no error in the trial court's rulings.
On 20 April 2015, in Wake County Superior Court, defendant Ray Muhammad was indicted on two counts of felony stalking. The matter was brought to trial before a jury during the 23 August 2016 criminal session of Wake County Superior Court, the Honorable Michael R. Morgan, Judge presiding.
Evidence admitted at trial tended to indicate the following: Defendant Ray Muhammad married Audrey Muhammad in June 2000. The couple had one child, Hannah,[1] and lived in California. The couple separated in 2005 and divorced in 2007. Audrey was granted custody of Hannah. Audrey testified that she divorced defendant because he was sexually abusing their daughter.[2] Audrey and Hannah moved to North Carolina in 2007.
After a 2009 encounter in Chicago, during which defendant attempted to touch Hannah who was then eight years old, Audrey sought a restraining order against defendant. Audrey filed for the restraining order in a California Superior Court. The California Superior Court granted Audrey a restraining order against defendant which was to remain in effect for three years, until 25 May 2012. The order stated that defendant must not "harass, attack, strike, threaten, assault, hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, ... block movements"; "[c]ontact, telephone, or send messages or mail or email"; or "[t]ake any action, directly or through others, to get addresses or locations of any protected persons." Furthermore, the order directed defendant to stay at least 100 yards away from Audrey and Hannah, their home, Audrey's job, and Hannah's school.
In July 2009, after the restraining order had been entered, defendant-a California resident-went to Hannah's school in North Carolina. When Audrey learned of this, she called the police. Audrey also learned that defendant-still a California resident-had purchased a townhouse in North Carolina, near Hannah's school. Though she did not have any contact with defendant, other than in court, Audrey testified to being "[t]errified that he was that close and the prospect of him moving here."
Throughout the three years the restraining order was in effect, "[defendant] was always filing something. ... There were Court hearings on him trying to modify custody, ... terminate child payments, child support payments." Audrey was represented by an attorney during these proceedings, and her attorney's address was listed on the restraining order. Nevertheless defendant sent mailings seeking changes of custody and visitation directly to Audrey's residential address and U.S. Post Office box demanding that she respond back to him within a specific time frame with a "wet ink signature." The letters defendant mailed to Audrey in June and July 2010 were produced at trial. Audrey's attorney had reviewed the documents "and he was like, I haven't seen this. This doesn't mean anything. This is some sovereignty state thing. ... He says it doesn't mean anything. It wasn't anything and some of those initials weren't anything from a [c]ourt."
In his defense, defendant testified that he lived in Richmond, California, and except for attending college, has lived there all of his life. He said his marriage with Audrey was turbulent. In the five years between getting married and being legally separated, defendant left the relationship twice.
A. ... [T]here were just too many occasions where-and even in the early on in the relationship, where Audrey would just be mean. She would be hostile. She would say disrespectful things and act as if she really did not want to be married and really felt that it was okay to when you get angry with somebody that meant it was okay to treat them badly.
....
I knew in my gut that things were not right, but I felt that I was obligated to her to try to give her a chance to improve her-the way she was treating me.
Both defendant and Audrey observed the Islamic faith. Defendant testified he was not active but did attend gatherings in observance of Savior's Day, Holy Day of Atonement, and Founder's Day. According to defendant, Audrey remained active in the Nation of Islam.
A. ... [S]ince we were divorced [in 2009] ..., my knowledge of her involvement was based on we have the Final Call newspaper and that is the national newspaper for the Nation of Islam, and Audrey wrote articles in the Final Call newspaper, and so that is primarily how-and she was also, of course, living in another city at the time, but basically my specific information I knew about her was what I saw in the Final Call newspaper and also she has a website for a magazine that she has as well.
So I have also seen her website as well.
I am sorry. And also her magazine comes out in hard copies, so I have also had issues of her Final Call-I mean, her magazine as well.
On 27 February 2009, the date of the Chicago incident, defendant attended a convention in observance of Savior's Day. On direct examination, defendant testified that one of the Chicago convention presenters was the husband of the principal of Hannah's school in North Carolina and that the principal flew fourteen of her students from North Carolina to the Chicago convention.
Q. And was there some chance that you and Audrey may see each other at Nation of Islam events?
A. Yes.
Defendant testified that when he saw Hannah at the convention, he approached and said, assalamu alaikum, a typical Muslim greeting, whereupon, members of Audrey's family physically attacked defendant. Defendant acknowledged that the California Superior Court issued a restraining order against defendant in favor of Audrey but also stated that the court issued a restraining order against Audrey in favor of defendant.
The indictment charging defendant with two counts of felony stalking alleged that "on or about ... July 13, 2009 ... [defendant] travel[ed] across the country to appear at [his] daughter's school in Wake County." Defendant testified that he was in California on July 13 but acknowledged that he was in Raleigh the preceding week.
[The indictment further alleged that] on or about and between June 23, 2010 through and until July 20, 2010, in Wake County, the Defendant ... unlawfully, willfully, and feloniously did, without legal purpose, on more than one occasion harass and engage in a course of conduct directed at Audrey Muhammad by sending repeated certified mail through the U.S. Postal Service to Audrey Muhammad.
Defendant challenged the characterization of the correspondence he sent Audrey as stalking. Defendant testified that he had a legal basis for sending Audrey letters and that Audrey was not always represented by counsel.
Thereafter, the jury returned guilty verdicts against defendant on both counts of felonious stalking. Defendant was sentenced to an active term of five to fifteen months for each count, to be served consecutively. The trial court then suspended the active term sentences and placed defendant on supervised probation for a period of twenty-four months, to be transferred to California. Defendant appeals.
_________________________
On appeal, defendant asks (I) whether the trial court erred by denying his motion to dismiss; (II) whether there was sufficient evidence to convict him of both counts of felonious stalking or only one; and (III) whether irrelevant and prejudicial evidence was admitted before the jury.
Preservation of Issues I & II
Pursuant to our Rules of Appellate Procedure,
[i]n a criminal case, a defendant may not make insufficiency of the evidence to prove the crime charged the basis of an issue presented on appeal unless a motion to dismiss the action ... is made at trial. If a defendant makes such a motion after the State has presented all its evidence and has rested its case and that motion is denied and the defendant then introduces evidence, defendant's motion for dismissal ... made at the close of State's evidence is waived. Such a waiver precludes the defendant from urging the denial of such motion as a ground for appeal.
A defendant may make a motion to dismiss the action ... at the conclusion of all the evidence, irrespective of whether defendant made an earlier such motion. If the motion at the close of all the evidence is denied, the defendant may urge as ground for appeal the denial of the motion made at the conclusion of all the evidence. However, if a defendant fails to move to dismiss the action ... at the close of all the evidence, defendant may not challenge on appeal the sufficiency of the evidence to prove the crime charged .
N.C. R. App. P. 10(a)(3) (2018) (emphasis added).
At the close of the State's case, defendant made a motion asserting the State failed to meet every element of the offense of stalking. Defendant's motion was denied. Thereafter, defendant introduced evidence by testifying in his own defense. Thus, defendant waived his motion to dismiss made after the State rested its case. See id. ("[D]efendant's motion for dismissal ... made at the close of State's evidence is waived" if defendant introduces evidence.). After the close of all the evidence, defendant failed to renew his previous motion or otherwise move to dismiss the case. Thus, defendant failed to preserve for our review his motion to dismiss the two counts of felonious stalking on the basis of insufficiency of the evidence. See id. ("[I]f a defendant fails to move to dismiss the action ... at the close of all the evidence, defendant may not challenge on appeal the sufficiency of the evidence to prove the crime charged."). Therefore, in the instant appeal, we dismiss defendant's arguments raised in Issues I and II.
Defendant alternatively contends that if the issues presented on appeal were not preserved due to trial counsel's failure to renew defendant's motion to dismiss at the close of all evidence, this Court should determine whether defendant received ineffective assistance of counsel (hereinafter "IAC"). We consider defendant's IAC claim within our discussion of Issue III, infra .
III
Defendant argues the trial court erred by allowing the investigating officer, Officer Nugent, to testify about mailings defendant sent directly to her and to testify that defendant is a sovereign citizen who believes the law does not apply to him. Defendant contends that Officer Nugent's testimony was not relevant but highly prejudicial, and therefore, his convictions should be vacated. We disagree.
" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2017). "All relevant evidence is admissible .... Evidence which is not relevant is not admissible." Id. § 8C-1, Rule 402. Our Supreme Court has considered relevance a low bar to admissibility. See State v. Triplett , 368 N.C. 172, 175, 775 S.E.2d 805, 807 (2015) ("[W]e hold that the [evidence] ... meets the low bar of relevancy under our standard."); State v. Hembree , 368 N.C. 2, 17, 770 S.E.2d 77, 87 (2015) (stating that admissibility based on the logical relevance of evidence is a low bar). Moreover, while "[a] trial court's rulings on relevancy are technically not discretionary, ... we accord them great deference on appeal." State v. Lane , 365 N.C. 7, 27, 707 S.E.2d 210, 223 (2011) (citation omitted).
A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.
N.C. Gen. Stat. § 15A-1443(a) (2017).
Officer Nugent testified Audrey would receive "something in the mail" but wouldn't open it: "She felt sick opening it." So, Officer Nugent took photographs of the unopened envelopes. After contacting defendant via telephone to discuss the mailings, defendant began sending mailings directly to Officer Nugent.
A. In the mailings that he sent me, he shows-he claims to be a sovereign citizen, and it has all the package of-sovereign citizens claim to be outside of the law, that the law does not pertain to them, and receiving the mail, that the mailing-continued mailing just showed that he was not acknowledging the law.
Q. And just a couple clarifying questions. Do you recall exactly how many mailings you received from Mr. Muhammad?
A. Seven or eight. I am not sure. They are in my bag. I didn't count them.
Q. Can you explain for the jury what a sovereign citizen is?
....
A. In one of the packages he sent me, he says sovereign persona sovereign, so that has to do with sovereign citizen. Our department gives us training so we know how to deal with sovereign citizens and it shows that they feel that United States law does not pertain to them, that they are outside the law.
And as I had tried to reference before where Audrey had mentioned in these mailings that she was receiving, again, I don't recall the the word she used, but that it was just a bunch of garbage stuff that you don't know-it's a packet that is likely to confuse you. It doesn't have any legal bearing, but it will make demands, and that I was-I was to drop the case or else I am fined $2,000,000 or a list of eight different- eight to ten different things, $2,000,000 for this, for that, and if I don't pay up, then it's $1,000,000 a day because I am found at fault.
And it's just paperwork that is supposed to look like legal stuff and it has no legal bearing. It's just kind of to scare or harass. And I at one time had to take it to an attorney to see, am I really going to get sued $1,000,000 a day for this.
....
That was-this was me, specifically, sent to me specifically. Me being harassed. It had nothing to do with Audrey.
On appeal, defendant argues that Officer Nugent's testimony regarding the mailings from defendant "portrayed him as a man who routinely hijacks the court system to harass others .... [Officer] Nugent's testimony did nothing to advance the [S]tate's argument that [defendant] had engaged in a willful course of conduct, without legal purpose, to harass his ex-wife ...." Defendant contends that Officer Nugent's testimony branding him as a "sovereign citizen" painted him as a man who refused to acknowledge the law. Defendant argues that absent Officer Nugent's "irrelevant" testimony, there is a reasonable possibility the jurors would have found that defendant and Audrey were involved in continuing litigation and that he served her with pro se documents as part of an effort to establish his innocence.
In essence, defendant is arguing that Officer Nugent's testimony prejudiced the defense to the extent that it deprived defendant of a fair trial-a trial whose result is reliable. See N.C. Gen. Stat. § 15A-1443 ("Existence and showing of prejudice"). We disagree.
Indictments
Defendant was indicted on two counts of felonious stalking. In Count 1, defendant was charged with stalking by appearing at Hannah's school and sending certified mail between July 2009 and June 2010. Specifically, between 13 July 2009 and 21 June 2010, defendant unlawfully, willfully, and feloniously did, without legal purpose, on more than one occasion harass Audrey by traveling to appear at their daughter's school and sending certified mail through the U.S. Postal Service to Audrey. In Count 2, defendant was charged with stalking by sending repeated certified mail through the U.S. postal system to Audrey without legal purpose between 23 June and 20 July 2010. Specifically, between 23 June and 20 July 2010, defendant unlawfully, willfully, and feloniously, without legal purpose, on more than one occasion harassed Audrey by sending repeated certified mail through the U.S. Postal Service.
Evidence Admitted at Trial
Defendant described his marriage as one that from the beginning teetered between cohabitation and separation. The parties separated for the final time in 2005 and divorced in 2007.
Per the 2009 restraining order granted in favor of Audrey, the California court ordered that Audrey and Hannah were protected persons and defendant was not to "[c]ontact, telephone, or send messages or mail [to] or email"; or "[t]ake any action, directly or through others, to get addresses or locations of ...." Defendant was ordered to stay at least 100 yards away from Audrey and Hannah, their home, Audrey's job, and Hannah's school .[3]
The State presented evidence that the restraining order against defendant and in favor of Audrey and Hannah was effective beginning 26 May 2009. The director of Hannah's school testified that on or about 13 July 2009, defendant appeared at the school and asked for a tour. Due to the summer schedule, the students were not present and the administrator did not follow protocols for student safety, such as check for restraining orders on file. On the tour, the director showed defendant his daughter's classroom and some of her schoolwork. The director was personally unaware of the restraining order against defendant, restricting defendant from Hannah's school. However, the director did inform Audrey of defendant's visit during a casual conversation. Audrey was "very shaken and disturbed and upset." She reported the incident to law enforcement.[4]
At trial, defendant denied meeting the school director (who identified him during her testimony) and taking a tour of Hannah's school in violation of the restraining order. However, defendant did acknowledge that he purchased a townhome in Raleigh in 2008 and visited the property in July 2009, around the time that he reportedly visited the school.
In regard to receiving mail from defendant, Audrey testified that although the restraining order was in effect during 2009 and 2010, defendant sent mailings to her residence and to her P.O. Box in North Carolina, mailings that according to an attorney she asked to review the them, were "some sovereignty state thing ... [that] doesn't mean anything."
Upon review of the record, we hold that defendant has failed to establish a reasonable possibility that had Officer Nugent's testimony labeling defendant as a sovereign citizen or a person who routinely harasses others by sending letters via the U.S. Postal Service had not been admitted, the jury would have reached a different verdict. See N.C. Gen. Stat. § 15A-1443 ("Existence and showing of prejudice").
In regard to defendant's IAC claim predicated on the argument raised on appeal in Issue I , supra -that there was insufficient evidence to establish felonious stalking because there was no evidence defendant acted without a legal purpose-we hold there was sufficient evidence presented for a jury to find that defendant's actions were intended to harass and that defendant acted without a legal purpose. Thus, defendant cannot show his counsel's performance was deficient and that there was prejudice to his defense. Defendant's IAC argument is overruled. See Strickland v. Washington , 466 U.S. 668, 80 L.Ed. 2d 674 (1984) (holding that in order to show ineffective assistance of counsel, defendants must show that counsel's performance was deficient and that the deficient performance prejudiced the defense); accord State v. Braswell , 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). Accordingly, defendant's arguments are overruled.
DISMISSED IN PART; NO ERROR IN PART.
Report per Rule 30(e).
Judges MURPHY and ARROWOOD concur.

A pseudonym is used to protect the minor child's identity and for ease of reading. See N.C. R. App. P. 3.1(b) (2018).

Defendant testified that he was never interrogated, charged, or convicted of sexually abusing his daughter.

During cross-examination, defendant testified that there was a custody order in place during the 2009 Chicago incident that would allow him to visit his daughter "only after [he] complete[d] sexual offender treatment and apologize[d] to [Hannah]."

On appeal (Issue II ), defendant argues that a fatal variance exists between the indictment, which alleges that defendant visited Hannah's school on or after 13 July and the State's evidence which indicated that defendant visited the school in the week prior to 13 July. On appeal, defendant argues that because he relied on the dates set forth in the indictment in presenting his defense (he evidenced he was California on 13 July), the Count 1 of the indictment must be dismissed. However, this argument was dismissed for defendant's failure to preserve the issue before the trial court. See, supra, Preservation of Issues I & II .
Still, defendant contends that his arguments must be addressed as part of his IAC claim: trial counsel failed to renew defendant's motion to dismiss at the close of the evidence and preserve defendant's arguments challenging the sufficiency of the evidence for appeal. See State v. Robinson , 236 N.C. App. 446, 449, 763 S.E.2d 178, 180 (2014) ("An IAC claim must establish both that the professional assistance [the] defendant received was unreasonable and that the trial would have had a different outcome in the absence of such assistance." (citation omitted) ), aff'd as modified , 368 N.C. 402, 777 S.E.2d 755 (2015).
We note that the argument defendant presents on appeal was not presented before the trial court. Before the trial court, following the close of the State's evidence, defendant argued that Count 1 of the indictment must be dismissed where the State failed to evidence a specific date on which defendant went to Hannah's school-given the date range stated in the indictment-and even if defendant visited the school, neither Audrey nor Hannah were present. As the arguments raised before this Court in Issue II were not presented before the trial court, we need not consider those arguments in the context of defendant's IAC claim. See State v. Sharpe , 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) (holding that where a theory argued on appeal was not raised before the trial court, "the law does not permit parties to swap horses between courts in order to get a better mount in [an appellate court]."); id. (quoting State v. Hunter , 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982) ) ("The theory upon which a case is tried in the lower court must control in construing the record and determining the validity of the exceptions.").